## MOLONEY et al. v. F. A. KUHNERT CORPORATION.

District Court, W. D. New York. July 12, 1929.

Edward H. Cumpston, of Rochester, N. Y., for plaintiffs.

C. Schuyler Davis, of Rochester, N. Y., for defendant.

HAZEL, District Judge. This is a suit in equity for infringement of letters patent to Michael J. Moloney, No. 1,206,018, dated November 28, 1916, for a method of making welt shoes.

The plaintiffs acquired title by assignment and license, respectively, as hereinafter ruled.

Prior to the patent in suit, there was a desire for the manufacture of inexpensive welt shoes for small children's wear—a flexible, light, soft product having durability and strength and of fine material to supply the

existing demand. The patentee in his method of fabrication used a smooth insole of thin, lightweight, soft leather in making the welt shoes, without using nails, ribs, or other rough parts to vex the foot. The welt was of strip leather stretched to the shoe upper. The edge of the insole was thinned, and, after cementing around the edge, tacked onto the last; while the upper, after damping or tempering, was drawn over the last and insole and then tacked to the welt over the glued part. Upon drying the shoe upper, the tacks holding the parts in position are taken out, leaving the parts firmly glued in place. In this unfinished condition of the shoe, a filler of cork is put over the insole space caused by the welt and cemented to the insole within the space, imparting a smooth surface for sewing on the outer sole covering the filler material. It was necessary, to achieve the result, that the upper and welt, joined together, be accurately lasted and firmly held to the last while the shoe was yet to be finished. The shaping and positioning of the surface sole, and indeed the appearance of the entire shoe, depended upon the proper positioning and fastening of the upper and welt to the last and keeping them in place by tacking while the upper and welt were drying from previous tempering. To produce a shoe without tacks, one of the important features of the patent, all the attachable parts, through the entire length of the shoe, were cemented after they were shaped and before removal from the last, to enable placing the filler on the inner sole, and then sewing on the surface sole, as already stated. These combined steps were a departure from previous methods drawn to my attention, and produced a superior welt shoe for infants, to wit, a smooth, flexible, comfortable sole at reduced cost, without any tacks, as distinguished from what is known as the Goodyear welt or old turn methods of fabricating leather shoes. It is proven that plaintiff's type of infant's or baby's shoes has become exceedingly popular and has found great favor in the shoe industry.

The patent has broad and specific claims, reading as follows:

"1. The method of making a shoe comprising securing an inner sole to the bottom of a last, inserting the last in a tempered upper having a welt secured thereto, securing the welt to the inner sole and the last, allowing the upper to dry, cementing the inner sole to the upper face of the welt and stitching an outer sole to the welt.

"2. The method of making a shoe comprising securing an inner sole to the bottom of a last, inserting the last in a tempered upper having a welt secured thereto, tacking the welt to the inner sole and the last, allowing the upper to dry, removing the tacks, cementing the welt to the inner sole and securing an outer sole to the welt.

"3. The method of making a shoe comprising tacking an inner sole to a last, inserting the last in a tempered upper having a welt secured thereto, tacking the welt to the last through the insole, allowing the upper to dry thoroughly, removing the tacks from the welt, cementing the welt to the inner sole, cementing a filler to the bottom of the inner sole, cementing an outer sole to the welt, and stitching the welt and the outer sole together."

Each claim, it will be noted, stresses securing the shoe upper and welt to the inner sole and producing a nailless shoe, as heretofore mentioned. Although the invention belongs to a crowded art, showing that steps consisting of sewing the welt to the upper before lasting, tempering the leather to aid lasting, and cementing the shoe parts, were old adaptations, yet the different elements of the claims in suit, in combination, had not been assembled before to produce a new result. The patentee in an old combination introduced new elements; i. e., tacking the upper and welt to the insole after damping, and then allowing the dampened parts to dry to enable snugly securing the parts by gluing them together, and finally forming a pliable, integral entirety without nails. Such an innovation over prior methods, though slight, nevertheless, in view of the commercial success attained by the article and the advantages derived, was, I think, the result of skill beyond the ordinary skill of the cobbler. It was manifestly a subordinate improvement in a limited field, but, since it did not occur to fabricators of infant's shoes that more lightness and softness of material might be especially desirable for babes, it ought not to be held devoid of patentable merit. The patent is analogous to the class of patents considered by the court in Frost Co. v. Cohn (C. C. A.) 119 F. 505, and Good Form Co. v. White (C. C. A.) 160 F. 661.

Defendant concedes that the combination has been used in its fabrication of a similar type of infant's shoe, but claims that it has abandoned such use, and, after this action was begun, resorted to fabricating infant's shoes under license, according to the patent to P. J. Byrne, granted March 17, 1925, which described method, plaintiff contends, is an infringement of the process in question. It is proven that an old employee of plain-

tiffs, one, Cesterna, was hired to come to defendant's factory at night to teach its employees how to operate plaintiff's method; and there is additional evidence tending to show that defendant finishes its welt shoes in the same way as described in plaintiff's patent. It makes no difference that in manufacture there is and has been a slight variation of the practice as to the order of performing the steps especially relating to cementing the shoe upper and welt to the sole. The transposition was not material. It originally grew out of the inventor's experience and hastened the completion of the shoe. Nothing is discovered in the prior art patents (though a large number were introduced in evidence) of anticipatory significance or to suggest plaintiff's process.

Importance is attached to the Goodyear welt, which, however, is a stiffer and heavier shoe, evidently designed for older children. It is nailless, but in its construction a heavier insole is used than is used in producing plaintiff's shoes. The steps of the process are not the same. Instead of forming the united upper and welt upon the last with tacks, the Goodyear welt requires a thicker and stiffer insole to hold the temporary nails, and also requires additional material for inseaming grooves which tends to impart more stiffness to the insole, and, no doubt, causes discomfort to the infant wearer. The difference between the two methods is not great; still the essence of Moloney's invention was to insure ease and comfort to the child wearing the shoe, which greater flexibility and softness of material in the fabrication of his shoes alone could supply. The patentee's mode of treatment of the materials—gluing parts of the materials in lieu of tacking— were essential steps. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 150.

The turn type method is also essentially different from the process with which we are dealing. The shoes are not soft-soled nor characteristic of the Moloney invention.

Other prior patents have been examined, but none of them are thought to be as close as the Goodyear welt. In each instance one or several steps are found, which also are included in the claims in issue, but the product is not of the kind with which we are herein concerned, and the means of production are not within the principles of plaintiff's patent, and therefore none are anticipatory.[1] American Tobacco Co. v. Streat

(C. C. A.) 83 F. 700; Hartford v. Moore (C. C.) 181 F. 132. It clearly appears that supplying infants with a light, soft, pliable welt shoe of high quality, without nails, was not an easy thing to do. The Goodyear welt method, the turn shoe without welt, and prior children's shoes, were thick and lacked desired yield in wearing. It was a problem which found no solution until the patentee's invention.

■■ As a further defense, defendant challenges the title of Anna Moloney and her co-plaintiff at the time of infringement. It appears that the patentee, Michael J. Moloney, prior to his death and prior to the infringement, assigned the patent to his sister, Anna Moloney (Exhibit B), subject to a license agreement to the Piehler Company. Royalties were paid to the patentee during his lifetime, beginning in 1916, and later to his sister, the assignee—an agreed amount on each pair of shoes made by the process. In 1926, the Piehler Company, owing to insolvency, executed a general assignment of all its property or interest in property, legal or equitable, to one Moll, who later, for value, transferred the assigned property, of whatsoever name or kind, by a bill of sale to one Weiss, including patents and trade-marks. Weiss thereupon transferred the property, including patents and trade-marks, and good will to La Londe, assignor of La Londe & Clarke, Inc. Defendant contends that the arrangement between the patentee and the Piehler Company was not a mere license to pay royalties, but in fact was an exclusive license or in effect an assignment, and hence the patentee had no longer an assignable title or interest in the patent; and, further, that La Londe & Clarke have not proved title to the license granted by the patentee to Piehler Company. The proofs are silent as to the precise arrangement by which the patent was originally assigned. Defendant fallaciously I think proceeded on the assumption that the license to Piehler Company was in writing and therefore required recording under the statute. The case of Jewett v. Atwood Suspender Co. (C. C.) 100 F. 647, is cited to sustain his point. In that case it was rightly ruled that a patent is transferable only according to the law of its creation, and cannot be transferred by general assignment in an insolvency proceeding in the absence of

---

[1] The illustrated models of shoes, claimed to have been made pursuant to what is shown in the Ballou, Keith, Fleming, Hedlund, and Byrne patents, I find do not strictly accord with the descriptions therein, and the models were seemingly reconstructed in simulation of plaintiffs' product; while defendant's witnesses admitted that the description in the Byrne patent was not followed in their manufacture of the infringing shoes.

a personal assignment by the owner. The evidence, however, does not show the execution of an assignment in writing by the patentee to Piehler Company. On the contrary, the stipulated royalties paid, failure, after search, to find an assignment, nothing of record, and the conditional assignment of the patent by the inventor to his sister, would seem to support the inference that the inventor, in his transaction with Piehler Company, did not divest himself of ownership or of all rights in his invention, and that the license was by parol. The burden was upon defendant to prove the original license to have been exclusive or in absolute terms an assignment. It has not done so. As the record stands, it appears prima facie that the plaintiffs are respectively owner and licensee to use and operate the process, and jointly have the right to maintain this action.

A decree may be entered, with costs, holding the patent in suit valid and the claims in controversy infringed by the defendant corporation.