STONE *v.* FRIEDMAN.

Dec. 14, 1953

No. 39003 46 Adv. S. 87 68 So. 2d 473

*J. H. Sumrall,* Jackson, for appellant.

*Farish, Keady & Campbell,* Greenville, for appellee.

ROBERDS, P. J.

The State Tax Commission levied against Friedman a use, or compensating tax, for the privilege of using, in and about the business of Friedman, certain tangible personal property Friedman had purchased without, and which had been shipped and delivered to him within, this state, as hereinafter set out. The amount of the tax was $899.95. Friedman paid the tax and, by this action in the circuit court, sought to have the Commission repay said amount to him. The trial court, hearing the matter without a jury, entered judgment for Friedman, from which the Commission appeals.

The tax was levied under Chapter 457, General Laws of Mississippi 1948, (amending Sections 10146, 10147, 10148 and 10149, Miss. Code 1942), which imposes a tax upon every person in this state for the privilege of using certain tangible personal property. But Section 4 (c) of said Chapter 457, provides that the tax shall not be levied in cases where such tangible property "would have been taxed at the wholesale rate." Chapter 467, Laws of 1948, prescribes the conditions under which tangible personal property is taxed at the wholesale rate. Sec. 1 (7) thereof reads "Sale of tangible personal property to manufacturers or processors, of machinery and machine parts which are exclusive necessities to processing within this state shall be construed to be wholesale sales, and the gross proceeds from such sales shall be taxable at the wholesale rate." Friedman claims he is a "processor," using his machines and machinery in the activity of processing, and is, therefore, exempt from the tax here levied under Section 4 (c) of said Chapter 457. The Commission says he is not a processor within the meaning of said Chapter 467. The question then for decision is whether Friedman was or was not a "proc-

essor''—whether he was using the machinery in question, the use of which constituted the basis of the tax, in the business of ''processing.''

The tax levy covered the period from January 1, 1949, to July 1, 1952. Within that period Friedman purchased outside, and had delivered to him within, this state one hydraulic press, one Kinsley crane, one compressor door, one Unit crane, one set of grapplers, and a number of press repair parts, at an aggregate purchase price of more than forty thousand dollars. The tax in question was levied upon the use of these machines and this machinery.

Friedman buys and has delivered to his yards at his place of business in Washington County scrap metal, such as old roofing, discarded automobiles, fence wire and other like materials. His servants separate the metal parts of these materials from the non-metal parts. As he expressed it they ''pull out non-ferrous materials, such as wood, rubber, rags and any other items that steel mills can't make steel out of.'' The metal parts, so separated, are then put through a certain process by use of said machinery. Friedman described that processing in these words: ''This property is used in the processing of light weight sheet iron which is a trade name designating tin, such as old car bodies, fenders, fence wire and old roofing and materials of that nature. When this material comes to our yard, it is unloaded into a stock pile extending to the press and from the stock pile it is fed into the press. The actual steps in the process are performed by hydraulic rams. When the material is in the charging box, the cover on the press is closed and the operator controls certain levers that make the rams go out under pressure. It gathers the material and compresses it into a small bale. This is done to meet mills' specifications.''

Again, in reply to a question to explain ''the baling principle under which that (hydraulic) press operates,''

he said: "It is driven by a large electric motor by hydraulic pumps, the pumps are controlled by levers, when the lever drops it opens the valve under the press which lets the oil go into the cylinders going into the ram which activates the ram going into the one that has the head on it. The first ram goes out 4 feet wide and 22 inches high and it fits right into the box. It is more or less the moving end of the charging box itself. It goes out to within 14 inches of the end of the box, then the side ram goes out and builds up its maximum pressure, it might go out within 14 inches or 18 inches, depending on the amount of the bale in the box but it builds up above the bale's density. It takes tremendous force to do that."

Eight photographs, depicting the stages of this work from the original stockpile to the completed bale, were introduced on the trial. In explaining photograph No. 7 Mr. Friedman said: "Well, it shows an overall view of the crane, feeding iron material or sheet iron into the loading hopper of the press, the loading crane, the grapple, the side of the press and the stockpile of finished bales and also the non-ferrous materials which we have pulled out of the press before making the bales."

It is further shown that the size of the bales is 14 by 14 inches and some are as high as 22 inches. They have a minimum weight of 75 pounds per cubic foot. The specifications are required by the United States Department of Commerce and by the steel mills who purchase the bales. Friedman sells these completed bales to steel mills. The price paid for the materials in bales is considerably more than could be realized therefor in loose form. In fact, no mill will buy the materials except they be compressed into bales. It is shown that the requirement for baling the materials, and the method of so doing, have come about within the past ten or fifteen years, and that old automobiles constitute the main source of such materials.

Mr. A. Bremer, a broker, engaged in the purchase and sale of the foregoing materials in six southern states, in reply to a question to explain the "metallurgic reason" for requiring the bales to have a 75 pound minimum density to the cubic foot, said: "It has been proved they take it in and take out the metal and by oxygenation it is now nil. It would produce no heat. Take the slag; the oxygen and the heat in this furnace would consume the light products and the metallics would go out the stack. So we say 75 pounds to the cubic foot whether small or large bale, to get it into the slag line to carry it underneath so the oxygen and heat doesn't consume it. This bale will go into the molten material and there be melted and we will recover the metallics and that is another reason to put it in that size bale.

"Q. That is an incident and the metallurgic reason is that you can't recover the metallics from the uncompressed steel because it would burn up?

"A. Yes, sir.

"Q. Is that the reason why steel mills require this metal to be compressed?

"A. Yes, sir."

Again he explained the necessity for such baling in these words: "In our particular mills we make this light metal—Wheeling makes buckets and tools. We take it out of the old material and make it into a light metal. We must trim it. We take these trimmings,—we call it blocking it,—and we take the new metal and we press our metal into bundles and we would have lost all the wire in strappings, bagging ties and fences. It is what we call an all-fall. We take this and bale it so as to get the density required. Up until now, so much ore was lost, we became concerned about the recovery of the ore. We saved everything we could save and the used metal had to be saved also.

"Q. Based on your knowledge of 22 years, would you say the compressing of this scrap metal is a necessary step in the making of steel?

"A. It is.

"Q. Is it an essential step?

"A. It is. It must have density to recover the metallics."

He further stated, "It wasn't necessary at one time to conserve the metal or raw material, but it became necessary to conserve all our natural resources—do you know they have gone all over the world to try to find it. Mills make so much of the light irons, narrow thin sheets, we need more of that. If we don't recover some, it will be lost to us."

He also explained that this business, and the method of and requirement for baling said materials, have developed within the past few years. He said there was no market at the mills for this material unless it was put into the baled finished form. Friedman and Bremer were the only witnesses.

Is Friedman a "processor," or engaged in the business of processing, within the meaning of our revenue statute?

Able counsel for both sides set out definitions of processing. We will select one from each brief. Counsel for appellant says, "The courts have uniformly subscribed to the following rule: A machine is a thing. A 'process' is an act or mode of acting. The one is visible to the eye, an object of perpetual observation; the other is a conception of the mind seen only by its effects when being executed or performed. Either may be the means of producing a useful result. And 'process' is a mode of treatment of certain materials to produce a given result. It is an act or a series of acts performed on the subject matter to be transformed and reduced to a different state or thing." Eastern Extracting Co. v. Greater N. Y. Extracting Co., 110 N. Y. S. 738; Cochrane v. Deener, 94 U. S. 139.

Appellee invokes this definition: ''But processing is a relative term. It embraces many modes of treatment of various materials to produce given results. It is an act or a series of acts with regard to the subject matter in its transformation to a different state of a different thing. It effectuates change in form, contour, chemical combination, physical appearance, or otherwise by artificial or natural means, and, in its more complicated form, involves progressive action in performing, producing or making something. Cochrane v. Deener, 94 U. S. 139, 24 L. Ed. 139 * * * '' and other cases. Under either definition Friedman is a processor or engaged in the business of processing in our opinion. His activity, in its nature and result, comes within said definitions. And the Legislature had good reason for the exception. It was to encourage the activity of processing in this state, thereby creating new industries, giving additional employment to labor, and bringing into the state property which would be subject to other taxation—in this case of the original value of over forty thousand dollars. Stone, State Tax Com. v. Taylor, 204 Miss. 820, 37 So. 2d 780.

Affirmed.

*Hall, Lee, Holmes* and *Ethridge, JJ.,* concur.