TOMPKINS v. ST. REGIS PAPER CO.

(District Court, N. D. New York. August 18, 1915.)

1. PATENTS ⬯286—SUIT FOR INFRINGEMENT—TITLE OF COMPLAINANT.

An existing cause of action for infringement of a patent may be assigned after expiration of the patent, and the assignee may maintain an action thereon.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 453–456; Dec. Dig. ⬯286.]

2. PATENTS ⬯7—PROCESS—FUNCTION OF MACHINE.

The mere function of a machine is not patentable as a process.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 6; Dec. Dig. ⬯7.]

3. PATENTS ⬯328—VALIDITY AND INFRINGEMENT—PROCESS OF MAKING PAPER STOCK.

The Tompkins patent, No. 458,135, for a process of making paper stock, which consists in effecting the suspension of the materials to be treated in a constantly rising current of the treating liquid, and while thus suspended subjecting the material to the heating, cleansing, or chemical action of the suspending liquid, is for a process, and not merely for the function of the apparatus described, but is void for anticipation in the prior art; also *held* not infringed, if conceded validity.

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by John D. Tompkins against the St. Regis Paper Company. On final hearing. Decree for defendant.

Suit in equity to recover profits and damages for alleged infringement of United States letters patent No. 458,135, issued August 18, 1891, on application filed July 30, 1888, and an accounting therefor. The suit is by the patentee.

A. Page Smith, of Albany, N. Y. (Edwin J. Prindle, of New York City, of counsel), for complainant.

W. B. Van Allen, of New York City (Henry Schreiter, of New York City, of counsel), for defendant.

RAY, District Judge. The patent in suit, alleged to have been infringed by defendant, dated August 18, 1891, and issued on application filed July 30, 1888, to John D. Tompkins, the complainant (his present title being by assignment), is for "a process of making paper stock," and has but one claim, which reads as follows:

"The herein described art of treating fibrous and other kindred materials for their conversion into paper stock, which consists in effecting the suspension of such materials in a constantly rising current of the treating liquid, and while thus suspended subjecting the material to the heating, cleansing, or chemical action of the suspending liquid."

This process consists, says the claim, in the art of treating fibrous and other kindred materials for their conversion into paper stock, and which process consists in (1) effecting the suspension of such materials (fibrous or their kindred) in a *constantly rising* current of the treating liquid; and (2) "while thus suspended subjecting the material (fibrous or their kindred) to the heating, cleansing, or chemical action of the suspending liquid." To answer the claim there must be a *constantly rising* current of the said liquid contained in the vessel or digester, and *in* this liquid the said fibrous material must be constantly suspended, and while so suspended it is subjected to the heating, cleansing, or chemical action of the "suspending liquid"; that is, of the constantly rising current of liquid.

The patentee first describes what he conceives to be the prior art and the objections to be overcome as follows:

"It has heretofore been the practice to subject vegetable and other kindred material from which paper stock is made to the successive action of various treating liquids within a closed vessel or digester, and while thus inclosed to bring the treating liquids into intimate contact with the material by spraying the liquids in a downward direction thereon, or by agitating the mass of material and liquids together, as by rotation of the digester. Both methods have been found in practice to be open to objection: The first, by reason of the fact that the downwardly directed streams of liquid serve to pack the paper stock material upon the bottom diaphragm of the digester, the effect of which is to transform the material into a strainer or filtering mass, gather the lignine and other material picked up by the treating liquors upon the top of the mass, and to unevenly affect the material by the treating liquids. It will be readily understood that, when the mass is packed upon the bottom of the digester, the upper portion of the mass will be much more affected than the lower portion, and hence the material will be fully acted upon in one portion, partially acted upon in another, and, to a great extent, unacted upon at the lowermost part of the mass. The second, that agitation of the material and liquids by rotation or other movement of the digester tends, in

a measure, to break up and destroy the fibrous character of the paper stock material thus acted on."

He then says his object is to treat the material in a closed digester and in such a manner that (1) no packing of the material will occur, by reason of the downward spraying above mentioned and the settling; (2) the fiber will not be injured, by the agitation of the material caused as by the rotation of the digester; (3) the adventitious materials will be separated from the paper material; and (4) all the material brought into the best position to be acted upon by the treating liquids evenly and at the same time effectively.

The patentee then points out that all, or nearly all, the substances from which paper is made are of a lower specific gravity than water, and hence will float in any of the treating liquids or fluids employed in this art. That such materials will also absorb the water, and when soaked with water sink or gravitate to the bottom of the vessel and become packed there. As a result such materials are not thoroughly and evenly acted upon by the treating liquids. He then says:·

"My improved method of treatment is based upon the theory that the material from which the paper stock is to be made should be suspended in the treating liquid while in the digester, and while thus suspended subjected to the heating, cleansing, or chemical action of the suspending liquid."

The patentee then describes an apparatus for carrying out his process, and then says:

"The material to be treated is introduced through the manhole D. At the same time the pump G is started, drawing the preliminary treating liquid from the tank within which it is stored, through the pipe II, and delivering it into the chamber C', and from thence in an upward direction through the perforations of the diaphragm, the sum of the areas of which is made preferably somewhat less than the area of the inlet pipe, so as to impart a certain velocity to the upwardly directed streams of liquid transmitted through the perforations. The upwardly directed streams are projected against the material as it is introduced into the digesting chamber, so as in effect to effectually spray the material from below as it falls into the chamber. When sufficient quantities of material and liquid have been introduced into the digesting chamber, the valve in the pipe II is closed, and the pump G draws the liquid from the upper chamber C, and introduces it into the lower chamber, from whence it is sprayed upward against the mass of material in the digester, which, becoming soaked, tends to gravitate. The effect of the upwardly directed streams of liquid impelled from the pump through the diaphragm is to overcome the gravity of the particles of material within the digesting chamber and to hold them, so to speak, in suspension in the treating liquid. It is my purpose in treating the material in the digesting chamber to keep the material in suspension in the treating liquid, and hence the direction of flow or circulation of the treating liquid is always from below upward."

Later he says he does not limit himself to the apparatus described, digester and pipe connections, as many changes may be made. He says, also:

"The apparatus shown and described is, however, that which I consider best adapted to carry my invention into effect."

In a general way the process may be described as follows: (1) The stock to be treated is inserted through the manhole in the top of the digester. (2) The treating liquid is forced in at the bottom through a

pipe or pipes by means of a pump. The contents of the digester are highly heated and steam is forced in at the bottom. A pipe from the top extends to and connects with this injection pipe, so as to allow a constant upward current of the treating liquid. When the cooking or treating process is complete, the contents may be drawn off through a conduit at the bottom of the digester. The idea is that by reason of the constant upward current of treating liquid, combined with the steam, when used, the matter to be treated will be constantly forced or carried upward and held suspended in the liquid in a loose, disintegrated mass, as contradistinguished from a solid, packed mass, and that its particles will be thus subjected on all sides to treatment by such liquid.

## Complainant's Title.

[1] The complainant is the patentee, but very soon after the issue of the patent in suit, and August 25, 1891, he assigned it to the Tompkins Paper Stock Company, of Albany, N. Y., receiving stock in said company in exchange therefor. Later, and January 20, 1899, on foreclosure, the letters patent were sold to Emma A. Tompkins, wife of the complainant, and she owned same until December 16, 1911, when she assigned same to the complainant. The patent expired August 17, 1908, or about three years prior to the assignment to complainant. If a cause of action for infringement then existed, it could be assigned; but there could be no infringement after the expiration of the patent. The defendant asserts that this complainant cannot sustain this action in equity to recover damages and profits; it having been commenced by the assignee after the expiration of the patent, and the assignment having been executed thereafter. Defendant insists there was nothing to assign, except a mere cause of action at law to recover the damages. Section 4919, R. S. U. S. (Comp. St. 1913, § 9464), provides for an action in the case by either patentee, assignee, or grantee. If complainant owns the right of action by assignment, if there be one, why can he not enforce it in any manner not forbidden by law?

## Is The Patent Valid?

[2, 3] Defendant insists that the subject-matter of the patent in suit herein is not an "art" or "process," but merely the mechanical function of the apparatus. It is settled that the mere function of a machine is not patentable as a process. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139; Bush v. Jones, 184 U. S. 599, 22 Sup. Ct. 511, 46 L. Ed. 707; Carnegie v. Cambria, 185 U. S. 403, 425, 22 Sup. Ct. 698, 46 L. Ed. 968; Westinghouse v. Boyden, 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136; Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034; Corning v. Burden, 15 How. 252, 14 L. Ed. 683; Risdon Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899.

What does this machine or apparatus do? It is first filled with the treating fluid and stock to be treated thereby, and the purpose now is to hold the stock suspended in the fluid, to the end that the fluid may operate equally on all parts or sides thereof during the cooking process, which is carried on by admitting steam under pressure con-

stantly at or near the bottom of the digester. The ultimate purpose is to properly treat the stock with the fluid and by means of the steam in the preliminary cooking, and the apparatus in operation forces the treating fluid in and constantly upwards through the mass of stock, causing the particles of the stock to be suspended in the liquor. While so suspended, the stock is properly exposed to the action of such liquor. This apparatus is so designed, constructed, regulated, and operated that while in operation it causes the stock by action of the upwardly moving current to remain suspended in the liquid. The function of the digester proper is to hold the stock and treating liquor; of the injected steam to heat and at times aid in causing the suspension, so that the liquor can perform its function of operating on the stock. The apparatus, with its pump, forces the liquor in, forces it upwardly, and this carries with it the particles of stock upwardly in the treating liquid, and holds it there while the process of treatment is going on. I am unable to see that this is not a process patent. The function of the machine is not to perform the process of treatment, but to permit it to be performed. We have much more than the operation and effect of the apparatus, as was the case in Busch v. Jones, 184 U. S. 598, 607, 22 Sup. Ct. 511, 46 L. Ed. 707. The apparatus is the means by and through which the process may be carried on.

In Carnegie Steel Co. v. Cambria Iron Co., supra, the claims of the patent were for a process which, in the art of mixing molten metal, to secure uniformity of the same in its constituent parts preparatory to further treatment, consisted of the process of introducing into a mixing receptacle, through an opening therein, of successive portions of molten metal un-uniform in their nonmetallic constituents (sulphur, silicon, etc.), removing portions only of the composite molten contents of the receptacle without entirely emptying or draining the same, and successively replenishing the receptacle with fresh un-uniform additions, substantially as and for the purposes described. There was a large closed receptacle for holding the molten metal, which receptacle, heated at the beginning to prevent chilling, had an opening through which the molten metal was poured in. There was another opening at the other end of the receptacle, but high enough up so that a large portion of the contents were always retained therein, when through this last opening a portion of the contents was, by tipping the receptacle, poured out. Molten metal was brought in cars from different furnaces and discharged into this receptacle, and as these car loads differed, or were nonuniform, in their nonmetallic constituents, the object of pouring the different car loads into this one receptacle was to allow them to mix or commingle therein and become uniform, or substantially so. So commingled, a small portion was poured out, and an equal new supply of the un-uniform metal poured in; and hence, as this operation went on, a considerable time would elapse before the first charge would be exhausted, and hence there was obtained a near approach to uniformity in all the drawn-off portions. This receptacle received the molten metal poured in, and held it, and kept it hot while the mixing process went on within, without aid, and while these successive portions were drawn off or poured out

and new supplies poured in. The molten metals from different furnaces, un-uniform in their nonmetallic constituents commingle or mix themselves when in the receptacle. This was held a valid process patent. The court said:

"A mechanical patent is anticipated by a prior device of a like construction and capable of performing the same function; but it is otherwise with a process patent. The mere possession of an instrument or piece of mechanism contains no suggestion whatever of all the possible processes to which it may be adapted."

In the patent now being considered we have a receptacle within which the real process is carried on. There are three openings. At the top the material to be treated is admitted. Near the bottom the treating liquid is forced in, and through another opening the hot steam is forced in. This steam is forced in by an outside power, as by a motor. Neither the receptacle, or anything therein, or connected therewith, except the pipe for conveying the steam, has anything to do with this injection of the steam or of the fluid. There is an opening for drawing off the treated contents, and another for the escape of steam all properly controlled. The treating process takes place while the fibers of the material are suspended in the liquid, by its coming in contact with all exterior parts thereof. In Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139, the court said:

"A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."

In the case now before the court there is one thing to be treated and transformed, viz. the fibrous material or paper stock. This is to be treated by contact with a fluid containing certain ingredients which are to operate or act on such paper-making material. Heat and steam is required. Large quantities of this fibrous material are to be treated at the same time in the same liquid contained in the same vessel. To obtain good results all the surface of each separate chip or fiber of the stock is to be brought in direct contact with and exposed to the direct action of the treating fluid. The treating fluid is injected upwardly into the digester underneath the solids to be treated, and by forcing it in, and the action of the steam forced in in the same upward direction, the fibers or chips are caused to rise, and, so to say, float in, not on, the treating fluid, and so are exposed, each particle to the action of such fluid. The function of the apparatus in operation is to set the fluids in motion upwardly, carrying with them for certain distances the fibrous materials, and so place and hold them in position to be acted upon by the treating fluids. The real process, which is "a mode of treatment of certain materials to produce a given result," now begins. The apparatus holds the material to be treated suspended,

or in position, while the real process goes on. If this patented process consists wholly in holding suspended in the treating fluid the fibrous materials, then it may be said this is a patent for the function of the apparatus.

## Anticipation.

The defendant claims that the alleged "process" claimed in the patent· in suit is wholly anticipated by the Tompkins 1886 process patent, No. 340,640, issued April 27, 1886, and applied for July 2, 1885, and entitled "Process for Treating Vegetable Substances for Making Paper Stock." As the mechanism for carrying on a process is no part of the process, if the process *described* (whether claimed or not) in the Tompkins process patent of 1886 is the same as that described and claimed in the patent in suit, such prior patent is an anticipation, even if the mechanisms of the two apparatuses used differ. Aside from the apparatus, the only difference between the process of patent No.· 458,135, of 1891, the patent in suit, and the Tompkins prior process patent, No. 340,640, of 1886, is that in the patent in suit we have a continuous upward current of the steam and treating liquor, *except* that, when it is desired to clear the fibers from the perforated diaphragm at the top of the digester, the current is reversed, while in the said process patent of· 1886, in treating the fibrous contents with the liquid, the current was alternated; that is, for a time, 10 to 20 minutes, there was caused an upward current, and then for about the same time a downward current, except that when two digesters connected together were used the material to be treated in one was subjected to a constantly rising current of the treating liquor and in the other digester to a constantly descending current. But the idea and conception of the patent of 1891 was not new, so far as causing the material to be treated to rise in the treating liquid and there remain suspended and subject to action on all its outer surfaces by the treating liquor is concerned. That conception and.idea clearly was expressed in the 1886 process patent repeatedly, and also claimed; but it is evident that Tompkins, the patentee, then thought better results would be obtained by alternating at intervals of from 10 to 20 minutes the · upward and downward currents. He knew how to treat the fibrous contents with the liquid by suspending it in the liquid by means of a constantly rising current just as well in 1886 as he did in 1891, and the principle of operation, including suspension of the material in the liquor, was just as well understood in 1886 as in 1891. He chose to alternate the currents, first up and then down, as evidently he thought he would get better results by so doing. .

This is made very clear by a few quotations from the Tompkins process patent of 1886. Claim 6 of the patent reads as follows:

"In the manufacture of paper stock or fiber, the process above described of treating wood, straw, and other vegetable materials for reduction to pulp or fiber, which consists in confining the material within a digesting chamber which is separated by perforated diaphragms from liquid chambers which adjoin the respective opposite ends of the digesting chamber, then filling all the chambers with cooking liquid or liquor, and heating the same under pressure of steam, then holding the material in suspension in the cooking liquid by the alternate operations of reversely operating pumps and coacting pipes pro-.

vided with suitable cocks and having connection with both said liquid chambers, and repeatedly circulating the cooking liquid in alternating reversed directions by means of the same pumps operated at alternate times through this suspended mass of material, with suitable durations of circulation in each direction for preserving such suspension, substantially as described."

In stating the objects of that invention of 1886, the patentee says:

"And also to expose all the particles of the material in a uniform manner to the action of the constantly circulating liquors and waters it is heated with by means of alternating reversed directions of the currents of said liquors and waters through the mass, so that the particles will not become packed on the bottom of the digesting chamber, and so that all the particles in the mass will be simultaneously acted on and have their soluble portions uniformly dissolved and the cellulose portions uniformly disintegrated, and to thoroughly wash and rinse from the material all traces of soluble portions, alkali, and bleaching substance, together with the coloring matters in the material, by alternate reversal of circulation of the washing waters, and, finally, by a series of treatments of the mass within the digesting chamber in a progressive successive order (as will hereinafter be fully described), without removal or transfer of the material after being first introduced to any other vessel, to so digest the material, separate the cellulose from the lignine, and disintegrate the fiber and bleach the same, that the resultant product will be more quickly produced than heretofore, and be of a uniformly fine quality and free from all chemical substances and coloring matter, and be bleached, and colored with any color or shade of color preferred."

He then describes his digester and apparatus, of which those of the patent in suit are an almost exact duplication. Either can be used to carry on the process by alternating the currents or by making such currents continuous upwardly or downwardly. In the specifications the patent says:

"It is well known that in the process of cooking the materials for reduction to fiber or paper stock the soluble portions of the same will be taken up by the cooking liquor, which will gradually become thickened by the dissolved substances separating from the pure cellulose. In the old processes, where the cooking liquor is circulated continuously downward, the material becomes compacted in the lower portion of the digester, and the top portion of the mass operates as a strainer to prevent the thickening matter in the liquor from passing through the same, so that all the gummy portions of the dissolved substances associated with the fiber will be deposited in the uppermost portions of the compacted mass, and necessitates the transfer of the material to a special washing machine for effecting a cleansing of the fiber from the gums, acids, and other dissolved substances mixed in with the same, which washing is attended with a considerable amount of labor for handling the material, and the use of much fuel if the water is used hot, and the employment of a very great amount of water and considerable power for agitating the same while the washing is proceeded with. * * * In these old processes the continuously downward direction of circulation of the cooking liquor through the mass of fiber operates to produce in the same a few vertical channels, through which the liquor will freely pass and more rapidly affect the particles of the material immediately around these channels, while those particles more remote are less affected, as are also those portions of the material nearer the bottom of the digester; hence to complete the cooking of all portions of the material in these old processes some of the parts will be overcooked, while if overcooking be prevented some portions will not be properly cooked, and must be strained off by a subsequent operation to be recooked or otherwise operated with or be thrown away. In either case a loss will be had of either the good material or of time and power for the proper reduction of the same.

"One of the distinguishing features of this invention is the cooking of the material in hot (about boiling) water while the latter is circulated through the former at alternate times in opposite or reversed directions, preferably downward and upward, so that all packing of the material will be prevented, and the cooking water will be made to move in such an active contact with all the particles of the material treated that they will be made to move against each other in a loosened manner in all portions of the digester, and cause all the particles to be simultaneously and uniformly cooked, and the soluble portions of the lignine (dissolvable in water) to be uniformly dissolved, and the coloring matter extracted from the material, and thereby produce a partial disintegration of the material and a considerable reduction of its bulk, and removal of the larger portion of the coloring matter originally in the material, so as to leave (after washing) a less quantity of lignine to be dissolved and less work of disintegration of the material to be effected by the subsequent alkaline cooking, and a less amount of bleaching to be had in the final bleaching process to which the fiber will be subjected.

"Another distinguishing feature is the cooking of the material with boiling alkaline liquor under pressure while the latter is circulated through the body of the former continuously and in alternating reversed directions, preferably downward and upward at alternate times, whereby a packing of the particles of the treated material in the lower portion of the digesting chamber, as heretofore had, is effectually prevented, and the liquor is made to uniformly saturate and envelop all the particles being treated, and operate with equal strength on the same, while the particles are being stirred against each other and constantly changing in their relative situations in the digesting chamber, so that the alkali of the liquor will be brought into the most effective contact with all the particles and act simultaneously and uniformly on all the soluble matters associated with the pure cellulose in the treated material, and thereby rapidly effect a complete disintegration of the material and reduction of the same to fine fiber without any portions of the same being overcooked while other portions are only sufficiently cooked or undercooked, as heretofore had in the old processes.

"Another distinguishing feature of this invention is the treating of the disintegrated pure fiber to the action of a bleaching liquor (preferably chlorine liquor), with or without pressure, while it (the liquor) is being continuously circulated through the mass of fiber in alternating reversed directions, whereby all the particles of the fiber will be in a state of constant movement in the liquor, and be simultaneously and uniformly acted on by the chlorine or other bleaching agent held in the water, which saturates and penetrates these constantly moving fibers, so that each fiber will be as effectually acted on both externally and internally by the bleaching agent as the others."

Then the patent says that two digesters may be used, one connected with the other, and in one the currents may be *constantly* upward and in the other *constantly* downward, and adds:

"When the same advantageous results will be had as when the successive treatments are had in a single digester."

This is what the patent says:

"I have described my new process when a single digesting chamber is used; but, if preferred, this process can be practiced in an apparatus employing two digesters properly connected with each other by suitable pipes, so that when the circulations of the treating waters and liquors are upwardly through the mass in one digesting chamber they will be downwardly through that in the other, and the reverse alternately, when the same advantageous results will be had as when the successive treatments are had in a single digester."

He then refers to the prior art and says:

"This old mode of procedure forms no part of my invention, as in my process the digesting chamber is at first sufficiently filled by a single charge with

the material to be treated until completion in all its portions, and is then treated continuously and uniformly, so that the particles will be held substantially in suspension in the liquor, while the latter is forced by the actions of suitable reversely operating pumps to circulate in one direction for a suitable length of time by one of the pumps being operated for the time, and then in an opposite direction by the other pump for a similar length of time, to be followed by repeated and similar alternating reversed circulations of the liquor by the alternate actions of these pumps until all the particles of the material are uniformly and completely finished for withdrawal, or for discharge of the liquid or liquor from the completed pulp.  *  *  *  In my process this shifting of the mixed material and liquor from one end to the other of the digester, as in this old process in rotary digesters, is prevented, and the material is made to be constantly suspended in the treating liquor in the best condition for the active circulation of the treating liquor between the suspended particles in alternately reversed directions under the force of the reversely operating pumps employed at alternate times, whereby the liquor is made to affect every particle of the material uniformly the same as all the others until the completion of the treatment."

Here we have a statement twice repeated that in this process of the 1886 patent the material being treated or subjected to the process is *"made to be constantly suspended in the treating liquor,"* etc., so as to allow the liquor to reach all sides of it. It is seen that in the 1886 process patent, not only is the *constant* suspension of the material in the treating liquor fully described and its advantages pointed out, but the holding of this material suspended in the liquor is claimed, and it is also stated that the material may be subjected to treatment in two digesters, in one of which the current is kept *constantly ascending,* and in the other, following the old process, it is kept constantly descending. It is self-evident that the patentee knew and taught and disclosed to the world in this patent every thing disclosed and claimed in the patent in suit. If the process described and claimed in the later patent, the patent in suit, was disclosed in the prior process patent of 1886, but not there claimed, it was given to the world, and if claimed and covered by that prior patent the monopoly expired prior to the infringement alleged. But, in any event, it is not sued upon.

The complainant has laid stress on the use in the later patent of the word "constantly," referring to the current. The current in the 1886 process patent, so long as there was one, was *constant.* It was not always "constantly" in one direction, for it was sometimes changed in direction when only one digester was used. When two were used, the current was *constantly* moving upwardly in the one and constantly moving downwardly in the other, and, as seen, by the current, says the patent:

"The material is made to be *constantly suspended* in the treating liquor in the best condition for the active circulation of the treating liquor between the suspended particles," etc.

I will not quote fully the evidence of *defendant's* expert, Mr. Little; but he said, speaking of the 1886 patent:

"Obviously, during the entire period of upward flow, the exact process of patent 458,135, as defined in the claim thereof is being practiced and its advantages if any being secured."

226 F.—48

He also said:

."Assuming, therefore, for the purposes of this answer, that the theory of the patentee, already referred to, has any basis in fact, and that the suspension, which he required for the purposes of his process, and describes, is, in fact, effected, the theory of operation, upon which patent 458,135 is based, *is fully disclosed in patent No. 340,640*, and the apparatus and *method for carrying the theory into effect* are also fully described."

The witness, Mr. Little, also admitted that the apparatus of the later patent is essentially and practically the apparatus of the earlier patent, "with some nonessential changes in the pipe circuits," etc.

This constantly upward current of the treating liquid in a digester through the material to be treated is fully described and claimed in patent to John W. Dixon and George Harding, No. 54,510, dated May 8, 1866. In this we have a digester proper, with a space or chamber in the bottom, shut off by a perforated diaphragm, which contains treating fluid. Through this diaphragm and chamber extending downwardly is a passage for the escape of the treated pulp closed by a valve. From this chamber containing the fluid covered by this perforated diaphragm a circulating tube with a pump suitably attached extends upwardly on the outside of the digester to the interior of the top thereof. Place the material in the digester, the fluid in the chamber, and digester, if desired, also, and set your pump in motion by hand or a steam engine, and the fluid is drawn from the bottom chamber through the circulating tube, and forced in on top of the material, when by the exhaustion below it is drawn downwardly through the material to be treated. Reverse the operation by means of the pump, and the treating fluid is drawn from the top of the digester and forced through the circulating tube into the lower chamber, and thence constantly upwardly through the perforated diaphragm, and on up through the material undergoing the process. Says the patent:

"A circulating tube passes from below the diaphragm *B* to the upper part of the digester. In the course of this tube a rotary or reciprocating pump *H* is placed. This pump is to be driven by machinery, and produces a constant circulation of the digesting liquid from the lower chamber, *E*, below the diaphragm, through *G*, into the upper part of the digester, or, vice versa, from the upper part of the chamber down through tube *G* and the pump into the bottom of the digester, and thence upwardly, by virtue of the force of the pump, through the mass to be pulped."

Claim 2 reads:

"The pulp digester, in combination with a lower perforated diaphragm, a central pulp passage, a circulating tube and pump, to produce a circulation through the mass from bottom to top, or vice versa."

Here is disclosed in the prior art everything of importance so far as this process is concerned, except the statement that pulp materials, such as straw, wood, chips, and other vegetable matter, even if water-soaked, so they will sink in still water, will rise, and either float or remain suspended *in* a constantly rising current of fluid. Schoolboys in the country well understood this fact. It was fully disclosed in the patent to Tompkins of 1886. It is immaterial that the patentee did not claim that particular feature or even fully understand its merits. It is equally

immaterial that the public did not understand and actually appropriate it. It is all-sufficient that this feature was fully disclosed in the prior art.

In the Tilghman patent, of November 5, 1867, No. 70,485, for "improved mode of treating vegetable substances for making paper pulp," the fibers are treated in a *closed vessel* with a solution of sulphurous acid heated, and the beneficial results of a free circulation thereof through the material to be treated is pointed out. In the Chambers patent, No. 365,166, of June 21, 1887, in this same art, the patentee says:

"I do not reverse the currents in the liquor which are constantly maintained *in an upward direction.*"

Perforated diaphragms were well known in the prior art. The witness for complainant, Mr. Little, seemed to think there was great merit in the process of the patent in suit, in that it has a perforated diaphragm extending over the entire area of the digester near the bottom, so as to produce or allow an upward initial flow at all parts of such area, and a consequent upward movement or current of the liquid at all points from the bottom upwardly. But this is the construction of the earlier apparatus of Tompkins (1886). Return pipes were not new in the art.

### The Cotton Seed Contention.

It appears that the application for the patent in suit was once rejected on the prior patents, but later this was reversed, and the examiner said, speaking of the prior art, that:

It was "a treatment possibly adapted to wood, straw, and grasses, but *said* wholly to fail with the cotton seed waste, for which *this process* (that of the patent in suit) has been devised."

But this patent in suit is not a patent for a process for treating cotton seed waste. It has no such limitation, and, even if it did, the prior art points out and teaches the whole process of the patent in suit, even if it does not point out that it is especially adapted to the treatment of cotton seed waste. This court is wholly unable to see why the 1886 process patent of Tompkins will not treat cotton seed waste as well and in precisely the same mode as does the patent in suit, *provided* you keep up the constantly ascending currents of liquor. It is immaterial that Tompkins did not know the fact, if it be a fact. The mere adaptation of an old process to a new and similar use is not invention. Dunbar v. Myers, 94 U. S. 187, 24 L. Ed. 34. There must be some new conception. A mere duplication of the prior process and apparatus for the treatment of cotton seed waste did not make the duplication patentable.

### Currents of Liquid.

Much has been said on the argument or final hearing and in the briefs as to the causes of the upward currents and the downward currents, and the use and nonuse of steam for causing or producing or contributing to produce currents. There are certain natural laws which operate always when not obstructed. Liquids will flow down hill unless ob-

structed ·by a dam, or its equivalent, when a pool or pond is formed. The moon operates to draw and move the waters of the ocean and produce the rising and falling of the tides. Fluid in a digester, if let alone, will remain quiescent. Heat it at the bottom, and an upward current is at once set up, and particles of floatable matter contained therein will rise with the current of ascending heated fluid. Inject steam at or near the bottom of the digester, and the same result follows. If there is no escape provided at the top, an ascending and a descending current· is at once set up in the vessel. Heated fluid rises, and the colder fluid in the same vessel sinks and takes its place. Provide an escape at the top, and inject a new supply at the bottom, and this descending current will disappear, or exist in a minor degree only. If you add a pump, and pump in fluid, warm, hot, or cold, at the bottom; you will cause an upward current, and aid the heat, if used. If you have no heat, and force in fluid at the bottom with a pump, or by any means, you will cause an upward current. If you add ·a circulating pipe, and use a pump, you cause an added circulation or force to your current, and with a pump you will cause an upward current or a downward current, heat or no heat. These digesters are not operated without heat, but in those we are considering the currents are not to be caused by heating or the injection of steam. The pump is there, and it is intended for use, and is used, in carrying out the process. The heat is there, and, in fact, is used in carrying out the process. The patent says:

"O represents a pipe connected to any suitable source of steam, which pipe is connected through the branch pipes O', O² to the chambers O and O'. Suitable valves n are included in these pipes. A waste steam pipe P connects the upper chamber O with any suitable water tank or other device for collecting the condensed water from the steam. * * * Usually, however, I first subject the paper stock material to the action of highly heated water, which water may be heated external to the digester or within the digester, or steam introduced into the digester through the steam pipe O and O', O². I prefer that the preliminary cooking of the material should be accomplished with the temperature of the liquid below the boiling point, so as not to set the color in the material, and to effect the solution of the greater portion of the soluble materials contained within the paper stock material. Subsequent to the preliminary cooking, which may be continued for from one to four hours, as required, the materials may be washed and rinsed in one or more waters. Following the cooking and washing, the material is treated to a second cooking with any liquid of an alkaline character—as, for instance, a solution of caustic potash or soda—suitable to the material to be acted upon in the digester. * * * The alkaline liquors may be heated within the digester in a manner similar to the preliminary cooking liquor, and the cooking may be continued for from one to seven hours, as required."

· The steam pipe is there, and intended to be used, and is used, in the preliminary cooking, the first step of the actual process, but not for creating the current. In the 1886 patent it was disclaimed as a means for creating circulation. But the steam pipes were there, as they are found in the later patent. It is immaterial that it is not used to create or keep up the current. The forceable injection of the treating fluid by means of the pump is all-sufficient, and the use of the pump when the fluid is once in the digester is all-sufficient, to keep up a current ascending or descending or both. By simple arrangement the course

of the current may be changed or alternated, and all this is common to the earlier patent and the one in suit. The claims of the earlier patent (see claim 6, already quoted, for example) point out the pumps as the means for creating and keeping up the currents or circulation, while the use of steam is a part of the heating and cooking process. But, even if the 1886 patent contemplated the use of steam as auxiliary to the pump in creating and maintaining the circulation or currents, the omission of its *use* for such purpose in the apparatus of the patent in suit does not change the process or principle thereof. Such omission of use for such purpose does not constitute patentable invention. So, if steam was not used in the earlier patent for aiding to create the currents, and is used in the later for such purpose, there is no change of principle of operation or of process for the fact is steam *was used* in the 1886 patent and *is used* in the patent in suit in the preliminary cooking or treatment.

We have in the later patent the same steam pipe similarly arranged, and the letting in of steam at the same place when occasion demands. An objection to the use of steam, a current or jet of hot steam alone, for forcing the treating fluid up through the mass of pulp material packed in the digester ready for the treatment, is made. If this alone were used, the objection would be good as a jet of steam under great pressure of less diameter than that of the interior of the digester would be apt to cut its way up through the mass of material and form an opening of its own dimensions without thoroughly permeating the entire mass. But neither the patent of 1886 nor the patent in suit points out any such operation or process for causing the constantly upwardly moving current of the treating fluids. Hot steam forced into the bottom of the digester and into the treating fluid found there would commingle therewith and tend to heat it, and then both steam and fluid, under the impulse of the pump, would ascend equally throughout the entire sectional area of the digester, forming the continuously ascending current of treating fluid, which would disseminate itself throughout the entire mass, and lift the particles of wood, fiber, and cotton seed waste up with it, and cause them to float in the fluid, and some of the lighter particles would of course reach the upper perforated diaphragm, and after a little obstruct it, as is clearly shown by the fact that in the patent in suit this upper diaphragm is cleared of this obstruction by reversing the current, so it will move downwardly through the upper perforated diaphragm, and consequently clear away the gathered and adhering mass, greater or lesser, of material. I am of the opinion, and hold, that the patent in suit is invalid for the reasons stated.

I have also extensively considered the question of infringement, conceding validity, and am of the decided opinion that defendant does not infringe. The sulphite process of cooking pulp in a closed digester, as practiced at the time of the alleged infringement, is quite different from the process contemplated by the patent in suit. As I understand, the digester is thoroughly packed with the matter to be digested or treated and converted into cooked pulp. The digester is then filled about two-thirds the way up with the treating liquor. Then very hot

steam is forced in at the bottom, very slowly at first, and is under great pressure later on, and the whole contents are thoroughly cooked; the whole interior becoming very hot, of course. There is a steam vent near the top. I have quite fully pointed out my ideas of the operation of steam forced into such a mass of pulp material and treating liquor. I do not doubt that an ascending current, or many ascending currents, are set up by this injection of steam into the fluid at the lower part of the digester. It could not be otherwise, unless the laws of nature have forgotten their cunning. But the patent in suit did not monopolize, or even contemplate, this process of cooking pulp for making paper. The upward circulation of the treating fluid in the process of the patent in suit is created by a pump, the pumping in of the treating liquor itself, and not by the injection of very hot steam, slowly at first, and later under great pressure, with a vent at or near the top of the digester. The patent in suit is not a pioneer, as we have seen. There were several patents in this art, to which I have not called attention, and in fact it was a somewhat crowded art. This patent was limited, as the proceedings in the Patent Office show, in its scope, and is not broad enough to include a continuous upward current or movement of the treating liquid *produced by any and every means,* or by hot steam forced in alone.

The complainant contends in his supplemental memorandum that he is entitled to an interpretation of this patent in suit "broad enough to include suspension of the material being cooked, obtained by any sort of a continuous upward circulation." I cannot agree with this, or that the steam jet is the equivalent of a pump in this art. The same memorandum, submitted by the complainant in answer to the defendant's brief, says:

"While, therefore, Mr. Tompkins *illustrated* his invention by the use of a pump, the prior art clearly taught that the steam jet was the equivalent."

I cannot agree to this. In my judgment they are not equivalents. Possibly they might be in some places, to answer some particular purpose, but not here. As stated, the treating liquor in the patent in suit is pumped in by the pump, and forced upwardly by the pump, as a continuous operation acting on the treating liquor. In defendant's digester the treating liquor is placed in the digester to its full required capacity, commingling with the solids to be treated, and then the heat is applied and the currents created by forcing in very hot steam at the bottom, slowly at first, and then with force and rapidly, and as a consequence the secondary action is the creation of an upwardly moving current or currents of the heated liquor. Again, these modes of creating an upward current of the treating liquor, and the consequent suspension of the materials being treated therein and thereby, in my judgment, are not equivalents.

There will be a decree dismissing the bill, with costs.