**PHILLIPS PETROLEUM COMPANY**

v.

**SID RICHARDSON CARBON & GASOLINE CO., et al.**

**Civ. A. 4–63–110.**

United States District Court
N. D. Texas,
Fort Worth Division.

Sept. 9, 1968.

Sidney Neuman, Pendleton, Neuman, Seibold & Williams, Chicago, Ill., Ardell Young, Brown, Herman, Scott, Young & Dean, Fort Worth, Tex., Walter H. Schneider, Houston, Tex., for plaintiff.

Bruce Tittel and Wood, Herron & Evans, Cincinnati, Ohio, Rufus Garrett, Jr., Fort Worth, Tex., and J. A. Young, Bartlesville, Okl., for defendants.

## OPINION

BREWSTER, District Judge.

The Court has jurisdiction, pursuant to 28 U.S.C.A. Secs. 1338(a) and 1400 (b), of this patent infringement suit involving some of the giants in the carbon black manufacturing industry.

The original parties hereto were:

Plaintiff, Phillips Petroleum Company, a Delaware corporation.

Defendant, Sid Richardson Carbon & Gasoline Company, a Texas corporation.

Defendant, United Carbon Company, a Delaware corporation.

After the institution of this suit, United was acquired by Ashland Oil & Refining Co., a Kentucky corporation. United was dissolved under the acquisition plan, and its former operations have been continued as an unincorporated subdivision of Ashland. All of United's obligations were assumed by Ashland; and, by subsequent pleadings of the plaintiff and a plea of intervention, Ashland became a defendant and an intervenor herein during the early stages of discovery.

The patent in suit was issued to Phillips, assignee of the inventor, Joseph C. Krejci, on August 21, 1951, as U. S. Letters Patent No, 2,564,700, entitled, "Production of Carbon Black." It will be sometimes referred to herein as

"Patent 700". It is not a basic or pioneer patent.

Richardson began the manufacture of HAF and ISAF carbon blacks in its new plant at Big Spring, Texas, in 1961 under processes licensed to it by United. Those processes were covered by a patent issued to United as assignee of its employee, Williams, after the date of the Krejci patent. The differences in the HAF and ISAF processes are immaterial to this case. If one is an infringement, the other one is too; so, for the purpose of this case, the two will for the most part be discussed as if they were one. The license agreement provided that United would fully indemnify Richardson for damages sustained as a result of any claim for patent infringement. Phillips contends that Richardson has been continuously infringing Claim 26 of its Patent 700 by the use of such processes since 1961, and that the infringement will continue unless enjoined. It says that United induced and contributed to the infringement by the license to Richardson, and that Ashland's assumption of United's liabilities and its own conduct since the acquisition of United has made it "the real party-defendant in this litigation". It prays for damages and for an injunction enjoining further infringement.

By way of affirmative relief, Ashland and Richardson seek a declaratory judgment that the patent in suit is invalid, and a judgment for attorneys fees on account of Phillips' alleged lack of good faith in prosecuting this suit.

For the purpose of this trial, the issues dealing with liability were severed from those relating to damages; but the damage issues are now foreclosed by the determination that there is no liability. The judgment entered will therefore finally dispose of the case.

■■ There is no necessity for a detailed discussion of the validity of the patent in suit, as the patent will expire before this opinion can be completed.[1] The defendants' declaratory judgment action will therefore be moot. While the question of validity could under some circumstances still be an important factor in deciding an action for infringement and a cross-action for attorneys' fees such as are here involved, the Court's conclusions that there is no infringement even if the patent is valid and that there has been no bad faith in bringing or maintaining this suit will make the decision of that question unnecessary. Universal Oil Products Co. v. Globe Oil & Refining Co., 7 Cir., 137 F.2d 3 (1943), affirmed, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399; Kemart Corp. v. Printing Arts Research Laboratories, Inc., 9 Cir., 201 F.2d 624, 634 (1953). It will therefore be assumed *arguendo* in the discussion of the infringement issue that the patent in suit was valid.[2]

1. It is appropriate to point out in this connection that there have been no unnecessary delays in getting this case tried. In preliminary pre-trial conferences and in other meetings with counsel for all the parties, the Court was informed that the nature of the issues would make discovery extensive and time consuming. Through close contact with the developments of the case, the Court was convinced that diligent progress was being made in preparation for trial in spite of the protracted illness and subsequent death of the leading counsel for one of the parties. The case was set for pre-trial hearing and for trial at the earliest available date when the Court was advised that discovery had been completed. The time and talent devoted to preparation have resulted in a full and fair development of all the issues in a trial where each party has been represented by most competent counsel in the highest tradition of the profession.

2. The defendants alleged that Patent 700 was invalid for a number of reasons; but in their briefs filed after the conclusion of the trial they seriously urge only the following grounds:

(a) The process was not novel because of prior patents No. 2,090,766, issued to Rembert on August 24, 1937, No. 2,375,795, issued to Krejci on May 15, 1945, and No. 2,378,055, issued to Weigand et al., on June 12, 1945. The following citations are submitted in support of this contention: Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684,

558

The record in this case is voluminous. The transcript, with the depositions included, will run several thousand pages. The three separate depositions of the in-

15 L.Ed.2d 545 (1966); Murray Co. v. Continental Gin Co., 5 Cir., 264 F.2d 65 (1959); 35 U.S.C.A. Secs. 102, 103. When Claim 26 is taken as the Court construes it in this opinion, this contention is not valid.

(b) The claims were broadened during the prosecution of the application for the patent in suit after intervening rights had occurred. This is a serious point. The facts relating to it will be set out in detail as they are important in connection with Phillips argument that Claim 26 does not require tangential injection of the combustion materials to produce the inwardly spiralling mass of hot combustion gases that proceeds helically through the second zone of the furnace. The original application for the patent in suit was filed on April 25, 1947. It was amended in October, 1949, to meet a point raised by the Patent Examiner that the application ought to be limited to introduction of its feedstock in a vaporous condition. All of the examples and claims in those appl'cations provided for the tangential injection of a hot combustion mixture into the first zone to produce a helically moving, protective blanket of hot combustion gases for the feedstock and the carbon black being formed therefrom in their journey through the furnace. In 1949, Phillips and United became involved in a suit alleging infringement of a patent acquired by Phillips from Ayers. In the course of discovery during late 1949 and the first several months of 1950, Phillips learned that United's engineers were working on a carbon black process to be prosecuted in a two zone furnace which called for the axial injection of the combustion material. The flow of the mixture of air, fuel gas and feedstock through the furnace was to be linear and parallel to its axis. Work had begun on the United process in June, 1949. It was made a matter of public record in April, 1950, and again in August, 1950, in United's pleadings in the litigation. On September 19, 1950, Phillips offered as an amendment to its application for the patent in suit a claim that is now Patent Claim 26. This claim was the only one ever included in the application that did not specifically call for tangential injection of the combustion materials into the first zone. It is evident that Phillips was trying from the information it had to cover the process it had found out that United was using; but the Court is of the opinion that it
did not succeed. The failure to include specific words in the new claim calling for tangential injection did not in fact broaden the claim, because the essence of the claim was still the protective blanket of hot combustion gases surrounding the feedstock and carbon black during their course through the furnace. That could not be accomplished satisfactorily by any means other than tangential injection of the combustion material into the first cylinder. If the Court thought otherwise, it would conclude that Patent 700 was invalid under the rule that an applicant cannot broaden his claims to the prejudice of persons having intervening rights. Railway Co. v. Sayles, 97 U.S. 554, 248 L.Ed. 1053 (1879); Hazeltine Research, Inc. v. Zenith Radio Corp., 7 Cir., 388 F.2d 25 (1968).

(c) The best method for use of the process is not disclosed in the patent, and cannot be inferred therefrom. This point has reference to Phillips' method of making the HAF black it markets under its tradename, "Philblack O". Dr. Krejci admitted that Philblack O could not be produced from the information disclosed in Patent 700, and that the Philblack O method was the best method. The defendants' contention is corroborated by Phillips' conduct in providing in its license agreements covering the manufactuer of Philblack O that the licensees should keep the process a closely guarded secret. Phillips even sued one licensee for alleged disclosure of this process in violation of such an agreement. If the process was disclosed in the patent, there was no need for such an agreement. The Court is convinced from all the pertinent evidence that the Philblack O method was the best one under the Krejci patent, and that such patent failed to disclose the required information as to that method. This situation presents a most serious question, as the price an inventor must pay for his seventeen year patent monopoly is a disclosure of the invention which would enable persons skilled in the pertinent art to practice it. The grant of his patent is conditioned upon a full and fair disclosure of such information in order that the public may practice the invention upon the expiration of the patent. 35 U.S.C.A. Sec. 112; Universal Oil Products Co. v. Globe Oil & Ref. Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); Special Equipment Co. v. Coe, 324 U.S. 370, 65 S.Ct. 741, 89 L. Ed. 1006 (1945); Price-Trawick, Inc. v.

ventor, Dr. Krejci, all of which were offered in evidence, standing alone, are much longer than the transcript of proceedings in most cases on appeal. There are well over four hundred exhibits and some of them are technical and lengthy. Every effort will be made to summarize the facts as briefly as possible, consistent with the inclusion of enough information to enable a reviewing court to understand the issues, the findings and conclusions and the bases for them. Many facts are stipulated. Most of them appear in the pre-trial order. A few facts are established as a matter of law. All of those matters have been duly considered, whether they are specifically discussed herein or have gone without mention to avoid unduly lengthening this opinion.

That carbon black, sometimes called "lamp black" in its early days and now commonly referred to in the industry as "black", is a useful product has long been known; but the real boom in the manufacture of it began with the widespread use of rubber tires. It is made commercially from the partial combustion of petroleum hydrocarbons. Fossil fuels, such as oil and natural gas, have been the products most commonly used for fuel and feedstock. The furnace method, using residue crude oil as a feedstock, is the most usual type of manufacture today, with the channel method and the thermal method accounting for a total of less than one-fourth of the entire commercial output. The channel, thermal and gastex methods produced almost all the carbon black on the market before the advent of the oil furnace method in the early thirties. The changeover to the furnace process was brought about by the low yield of black and high cost of the other types of manufacture. Natural gas was the hydrocarbon used as the feedstock in those types, and the sharp increase in the price of such natural gas with the coming of the interstate gas pipelines to the big city markets made the manufacturers of carbon black look for a method where a cheaper feedstock could be used. The heavy residue left from crude oil after it had been cracked at refineries was the answer, and the furnace method was best suited for its use. The yield from this type of manufacture has been much higher and the cost much lower; but the industry has continued to look to channel black as the standard for measuring quality of the product for re-inforcing rubber. That the application for the patent in suit so recognizes is evidenced by the fact that one of the objects stated in it is the production of a carbon black of greater re-inforcing value than that of channel black.

There are many different grades and qualities of carbon black. Those differences may appear where the same apparatus and general methods are used. They are due to the variation in chemical reaction resulting from many things. The better grade of blacks have higher re-inforcing qualities for rubber by increasing its elasticity and resilience, and its resistance to abrasion, heat, cold, and damage from flexing. The top quality blacks are referred to as being fully re-inforcing, and they are used in tire treads and in better class rubber heels and soles for shoes. The grade just below the top is used for walls and carcasses of tires, belts for machinery, wire insulation, etc. The lower ones are used for products not subjected to as much strain as tires, and for pigment in paints, varnishes, inks and other products.

The types of carbon black which have figured to any appreciable extent in this case, together with the symbols by which they are generally identified and the trade names by which they are known, are:

(1) FEF (fast extruding furnace), sometimes identified as F–81. Phillips

Gaslift Corp., 5 Cir., 101 F.2d 134 (1939); Grant Paper Box Co. v. Russell Box Co., 1 Cir., 154 F.2d 729 (1946);

Flick-Reedy Corp. v. Hydro-Line Mfg. Co., 351 F.2d 546, 547 (1965).

gave it the trade designation, "Philblack A". It was well received on the market from the time of its introduction in the early forties, but it had its limitations. It was not a fully re-inforcing black, and therefore could not be used in rubber made for tire treads. The most common use of the rubber re-inforced by it was in the walls and carcasses of tires.

(2) HAF (high abrasion furnace black). Phillips began commercial production of it in 1947, and marketed it under the trade name, "Philblack O". This product is fully re-inforcing and rubber mixed with it can be used in tire treads.

(3) SAF (super abrasion furnace black). Phillips claims that Dr. Krejci is entitled to credit for this black. Commercial production began in 1952.

(4) ISAF (intermediate super abrasive furnace black). It is intermediate between HAF and SAF blacks. Columbian Carbon Co. introduced it. Commercial production began in 1953.

Each one of these carbon blacks has been manufactured by various companies and has been commercially successful. Phillips has received special recognition in the industry in the form of a plaque for the types of the above described blacks put out under its own trade names.

Richardson has been manufacturing carbon black for a number of years by means other than the furnace method. Its modern plant at Big Spring, Texas, constructed under specifications furnished by United, is a furnace plant exclusively. Phillips got into the carbon black industry in the 1930's. It acquired the Ayers Patent No. 2,292,344 covering a furnace method of making carbon black in the early 1940's. All of its manufacturing processes have required the use of a suitable furnace.

Dr. Joe Krejci, the inventor of Patent 700, is a chemical engineer and a long time employee of Phillips. He has been engaged by Phillips in an executive or research capacity in its carbon black division during all of the times material to this litigation. The patent protects only a particular process for making carbon black, as distinguished from a patent for a machine, an article of manufacture or a composition of matter. Dr. Krejci originally thought he had a unitary invention on the furnace and the process, and he first applied for a patent on both. The apparatus claims were rejected by the Patent Office on account of prior claims, and were later cancelled. Some of Phillips' arguments leave the impression that it has never fully realized that Patent 700 does not cover every process for manufacturing carbon black in the type of furnace used by it. There is no contention that these carbon black products themselves produced by Phillips and Richardson are covered by the patent. A number of producers of carbon black have long been manufacturing the same products here known as HAF and ISAF blacks by various processes in furnaces, even though they have been marketed under the manufacturer's own trade name.

■ There is little dispute among the parties about the correctness of the legal principles urged as being applicable to the infringement issue. The argument is over whether the evidence raises the issues governed by such principles, and, if so, what the facts are. Under the circumstances of this case, the question of whether there has been an infringement is only an issue of fact. Much opinion testimony of expert witnesses was offered on that issue. In most instances such testimony of each expert was contradicted by testimony of experts offered by the opposing side; but the credibility of that type of testimony, whether contradicted or not, is almost always for the trier of facts. Mound Co. v. Texas Co., 5 Cir., 298 F.2d 905 (1962); Mims v. United States, 5 Cir., 375 F.2d 135, footnote 2, at p. 140 (1967); Morris v. United States, D.C.Tex., 217 F.Supp. 220 (1963). This rule is especially applicable in this case where most of the expert witnesses have

been long time employees of the party offering them; and where it was admitted by all that, due to the extreme heat and pressure, there has to be some speculation about what goes on in the furnaces during the manufacture of carbon black.

■ The pertinent fundamental legal principles governing process patents can be summarized briefly. Sec. 100(b), Title 35, U.S.C.A., provides: "The term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material." Prior to the enactment of the present Title 35, U.S. Code, the patent statutes did not in express terms include processes among the patentable inventions. The decisions, however, interpreted the term "art", as used in the corresponding section of the prior statute, to include process or method. The following definition of "process" given by the Supreme Court in Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 138, 141 (1876), still stands:

"... A process is a mode of treatment of certain materials to produce a certain result. It is an act, or a series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing."

Mitchell v. Tilghman, 19 Wallace 287, 86 U.S. 287, 22 L.Ed. 125 (1873), was one of the early landmark cases on the patentability of a process. It involved a chemical process for producing free fat acids and glycerin from fats and oils of animal and vegetable origin containing glyceryl as their case. The Supreme Court held that the process patent was valid and was entitled to be protected when it was confined to the specific apparatus which had been disclosed as illustrating the manner in which the process was to be employed. The next landmark case in this field was Cochrane v. Deener, supra, which came only three years later. It involved a mechanical process for bolting flour. It relaxed the

limitations laid down in Mitchell v. Tilghman by holding that there could be a valid process patent unrestricted by the instrumentality used. Four years thereafter, the Tilghman patent was again before the Supreme Court in Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1880); and, in the opinion in that case, the Court without mentioning Cochrane v. Deener, said: "... Upon the renewed consideration which has been given to the subject, the court is unanimously of the opinion, contrary to the decision in the Mitchell case, that the patent of Tilghman must be sustained as a patent of a process, and not merely for the particular mode of applying and using the process pointed out in the specification ..." 102 U.S., at 708, 26 L.Ed. at 280. Since 1880, it has been consistently recognized that the following principles quoted from the opinion in Cochrane v. Deener, 94 U.S., at 788, 24 L.Ed. at 141, are applicable to a patent on a process, whether it be chemical or mechanical:

"... The process requires that certain things should be done with certain substances, and *in a certain order*; but the tools to be used in doing this may be of secondary consequence." (Emphasis supplied)

"... The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely different result ..."

"[A] process may be patentable, irrespective of the particular form of the instrumentalities used ..."

■ The patent in suit contains 29 claims. The only one alleged to have been infringed is Claim 26. Phillips, as the party charging infringement, has the burden of proving it. A. O. Smith Corp. v. Affiliated Gas Equipment Co., D.C. Tex, 107 F.Supp 251, affirmed 5 Cir., 205 F.2d 654 (1953); Harries v. Air King Products Co., 2 Cir., 183 F.2d 158 (1950).

562

Claim 26 is stated in one paragraph of the application, and, though here quoted verbatim, it is set out in step-by-step fashion for the purpose of clarity—

"26. A process of producing carbon black having high reinforcing properties in rubber similar to those of channel black which comprises.

introducing a vaporous hydrocarbon into a round first zone having a diameter greater than its length, said introduction being along the axis of said first zone,

establishing a mass of hot combustion gases surrounding said vaporous hydrocarbon, in said zone by injecting thereinto previously produced hot combustion gases,

continuously injecting said hot combustion gases into said mass to maintain a temperature above approximately 2600° F. in said round first zone,

continuously passing said vaporous hydrocarbons *surrounded by said hot combustion gases* axially into a round second zone the length of which is greater than its diameter and the diameter of which is less than that of said first zone, said second zone being in communication with and in axial alignment with said first zone,

forming carbon black from said vaporous hydrocarbon by pyyro-chemical (sic) action due to the heat of the *surrounding hot combustion gases* without the further addition of any substantial amount of air,

and separating said carbon black from the resultant gaseous products of said process." (Emphasis supplied).

While it is recognized that under the rule of Cochrane v. Deener, supra, the instrumentality employed for the performance of a process is not always controlling, the following statement from Carnegie Steel Co. v. Cambria Iron Co.,

185 U.S. 403, 415, 22 S.Ct. 698, 703, 46 L.Ed. 968, 978 (1902), is applicable here: "While the patent in suit is for a process, and not for a mechanism, the process will be more easily understood by a reference to the apparatus." The description of the respective furnaces [3] used by Phillips and Richardson that follows makes a comparison of the significant steps in the processes in question more easily understood.

The furnaces themselves are not as large as might be expected, but the extremely high pressures and temperatures to which they are subjected require unusually sturdy construction. The outside shell is heavy steel. The inside surface or lining, which is directly exposed to the heat, is made of some refractory material such as sillimanite or alumina brick. A thick layer of insulation fills the space between the inside liner and the outer shell.

The Phillips furnace consists of two connected, axially aligned, cylindrical sections. The first section, sometimes referred to as the "combustion zone", is shaped something like a drum, with its diameter much greater than its length. The opposite is true of the second section, often called the "reaction zone". It resembles a tunnel, with its length many times that of its diameter. No single exact measurement of either zone is required for the process. The application for the patent in suit and the evidence in this case indicate that the most preferred inside dimensions are considered by Dr. Krejci and the other Phillips engineers to be in the area of 33 inches in diameter and 11 or 12 inches in length for the combustion zone, and of 12 to 15 inches in diameter and 11 feet in length for the reaction zone. The general makeup of the Phillips apparatus appears in the diagrammatic drawing forming a part of the patent application. It was

3. The furnaces used by Phillips and Richardson for the operation of the processes in question will be referred to as the "Phillips furnace" and the "Richardson furnace," respectively. "Furnace", "apparatus" and "reactor" may also be used interchangeably. There is no evidence that either one of them has a patent on the furnaces used by it.

first admitted in evidence as PX-1, and again in an enlarged drawing as PX- 143, and appears in the following reproduction:

Aug. 21, 1951  J. C. KREJCI  2,564,700

PRODUCTION OF CARBON BLACK

Filed April 25, 1947

FIG. 1

FIG. 3

FIG. 4

FIG. 5

INVENTOR.
J. C. KREJCI

BY

ATTORNEYS

Diagrams of the respective furnaces used by Richardson for its HAF and ISAF processes appear in DX-186 and 187. They differ from each other only in the diameter of the choke zone, the length of the reaction zone, and the distance from the point of entry into such zone to the quench ports. A reproduction of only one of such drawings following this paragraph will therefore furnish an adequate basis for comparison with the drawing of the Phillips apparatus. The Richardson furnace has three axially aligned and connected zones instead of two. The first one is similar in shape to the combustion zone in the Phillips furnace, but differs a little in size. It is 36 inches in diameter and 15 inches in width. The second cylindrical section is the choke zone. The dimensions of it in the ISAF furnace are diameter, 6 inches, and length, 9 inches, while both the length and the diameter in the HAF furnace are 9 inches. The shoulder on each side of the choke cylinder is square, rather than round, to intensify the early mixing of the feedstock with the hot combustion products. The third zone is tunnel shaped like the second zone in the Phillips furnace. That cylinder is 15 inches in diameter in both the HAF and ISAF furnaces. The length of the tunnel in the HAF furnace is 11 feet, 3 inches, while that used in the ISAF process is 16½ feet. The peep holes and the radimatic eye appearing on the drawing have no function in the process. They show where such holes and eye were put on some test furnaces for the purpose of getting as much information as possible about what goes on during the operation of the processes. A reproduction of DX-187 follows

Insofar as this case is concerned, the essential differences between the Phillips and the Richardson furnaces are:

1. *Injection apparatus.* Phillips is designed for tangential injection of combustion components already mixed, while Richardson provides for separate introduction of air and fuel gas radially in a direction towards the circumferential surface of the first zone. Also, in the Phillips furnace there is no nozzle on the pipe used for introducing the feedstock.

2. *Number of zones.* The Richardson furnace has three zones and the Phillips has only two. This middle cylinder in the Richardson furnace serves to create the most fundamental difference between the processes in question by its effect on the heating, mixing and flow of the combustion products and feedstock.

The Phillips process, as practiced by it in all its operations under Claim 26 of Patent 700, calls for the injection into the first zone of its furnace of "previously produced hot combustion gases". This inflammable mixture of air and fuel gas is introduced in such a manner that it flows circumferentially around the wall of the cylinder while it is burning and creating a temperature of more than 2600° F. That flow is accomplished by injecting the previously heated mixture of air and gas at a high velocity through inlets such as are shown in Figure 1 on PX-143 into such combustion zone in a direction tangent to its cylindrical wall. The swirling motion of the hot combustion gases following the circumferential surface of the cylinder creates a tornado-like vortex which proceeds out of the first zone and through the entire second zone in a helical manner. The centrifugal force of the vortex causes the hot combustion gases to form a layer which hugs the walls of the second cylinder as they run their course through the fur-

nace. The heavy residue oil used for feedstock is preheated to the point that it can be injected into the first zone in a vaporous state. The vapor enters that zone through a feed pipe identified by the number 16 in Figures 2 and 5 of PX-143. The pipe is so arranged that the vaporous feedstock is introduced into the eye of the vortex and passes axially through both zones of the furnace. The rotating hot combustion gases make a blanket around the feedstock and carbon black being formed during their entire journey through the furnace. Phillips claims that this continuous blanketing is an important feature of its process for two reasons: (1) It results in a delayed and controlled heating of the feedstock and reduces the mixing of it with the combustion gases to a minimum. Phillips claims that this feature has a significant effect on the properties of the carbon black being made. (2) It prevents any particles of the feedstock from coming into contact with and forming carbon deposits on the wall of the reaction zone [4]. Phillips says that deposits of that kind later loosen from the wall and become mixed with black being made, thereby adversely affecting the quality and type of the black. The burning of the fuel mixture takes place almost entirely in the first section. The conversion of the feedstock into carbon black occurs in the second zone, and the black itself is protected by the swirling blanket of hot combustion gases as it forms in and passes on through such zone. The combustion of the feedstock is accomplished by heat radiated from the hot combustion gases rather than by flame or by mixing.

The accused Richardson process involves no preheating of air, fuel gas or hydrocarbon feedstock before they are introduced into the furnace. The air and gas are separately injected axially into the combustion zone in a radial direction

---

4. The tentative findings of fact and conclusions of law submitted by the plaintiff several days after the close of the case propose that the Court find in this connection: " * * * As the hydrocarbon enters the section 10 [the reaction zone], it is surrounded by hot combustion gases which serve as a blanket which protects the walls of the interior of the furnace, thus preventing carbon from depositing upon the walls or the build-up of undesirable coke formations. * * *"

outwards towards the circumferential wall at a velocity of approximately 1300 miles per hour. They become mixed and burn almost completely in the first zone at a temperature of around 3000° F. The feedstock is introduced axially into this zone in a substantially liquid condition through a feedpipe at the center of the injector assembly, either in a stream about the size of a pencil in making ISAF or in a conical spray with an inside angle from 30° to 90° in manufacturing HAF. The variations in the included angle of the spray are accomplished by an adjustment of the nozzle on the tip of the oil injector pipe inside the combustion zone. The properties of the carbon black are affected by such variations. The injector assembly for the introduction of air, fuel gas and feedstock is depicted in the reproduction of DX-185 which follows.

RICHARDSON INJECTOR—BURNER

The fact that the air and gas are injected directly at, instead of tangentially with, the circumferential wall of the first cylinder causes a turbulent or boiling movement of the combustion gases, instead of a swirling one. The choke zone, which is the second one in this process, intensifies this turbulence and causes an immediate, intimate mixing of the combustion products and the feedstock. The dimensions of the choke determine the amount of the turbulence and thereby materially affect the re-inforcing qualities of the carbon black being produced. The mixture continues through the third cylinder, or reaction zone, in this turbulent fashion as the hydrocarbon feedstock is being converted into carbon black by being intimately mixed with the hot combustion products. This disposition of the feedstock and the forming carbon black across the entire diameter of the third zone begins the instant the mixture leaves the choke ring. The flow of the turbulent mixture through all of the zones is linear.

These are chemical processes which transform heavy residue crude oil into carbon black having certain desired properties. To borrow from the definition of "process" already quoted from Cochrane v. Deener, supra, they involve "a series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing." As is so often the case in organic chemistry, the transformation of the subject matter here is brought about, not by the chemical reaction of one substance coming into contact with another, but by the application of nature's forces—heat, mixing and motion—in a certain manner and "in a certain order." While natural laws in the abstract are not patentable inventions, the novel embodiment of them in a practical mode of carrying them into useful effect is patentable. Mackay Radio & Telegraph Co. v. Radio Corp. of America, 306 U.S. 86, 59 S.Ct. 427, 83 L.Ed. 506 (1939). The determination of whether the accused process infringes the patent in suit will depend upon whether it "functions *in substantially the same manner* and *under the same physical laws* to produce the same result as that of the patented process." Great Lakes Carbon Corporation v. Continental Oil Co., D.C. Law, 219 F.Supp. 468, 476 (1963), affirmed, 5 Cir., 345 F.2d 175, cert. den. 382 U.S. 905, 86 S.Ct 241, 15 L.Ed.2d 158 (emphasis added); Kemart Corp. v. Printing Research Laboratories, supra, 201 F.2d at 629. The fact that such process utilizes the same natural laws and produces the same product does not necessarily demand a conclusion of infringement. No product patent is involved, and Phillips may not, therefore, "by claiming a product or method in terms of result, function or broad class, foreclose all means and ways of practically obtaining such result." Minnesota Mining & Mfg. Co. v. Technical Tape Corp., D.C.Ill., 200 F.Supp. 753, 758 (1961), affirmed, 7 Cir., 309 F.2d 55, cert. den. 372 U.S. 942, 83 S.Ct. 936, 9 L.Ed.2d 968; Allen v. Standard Crankshaft & Hydraulic Company, D.C.N.C., 210 F.Supp. 844, 845, 850 (1962), affirmed, 4 Cir, 323 F.2d 29. Natural forces in themselves and the principles involved in the use of them are available to every one. O'Reilly v. Morse, 15 Howard 62, 14 L.Ed. 601 (1853). Even though the same product is being produced by the use of some of the same natural forces, there is no infringement if there are substantive and essential differences in the application of them. "The application of a known force to known objects in a new manner is a different act . . . ." Kirchberger v. American Acetylene Burner Co., 2 Cir., 124 F. 764 (1903).

A comparison of the Phillips and Richardson processes reveals that they do not function "in substantially the same manner" and "under the same physical laws" on account of each of the following substantial differences:

1. *Heating and mixing prior to injection.* Phillips combines its air and fuel gas prior to injection and introduces them into the furnace as a mixture. Both the feedstock and the combustion mixture are heated prior to injection. The feedstock enters the furnace as a

vapor. There is no premixing or preheating in the Richardson process. The feedstock is introduced in a substantially liquid condition.

2. *Injection.* Phillips introduces the preheated combustion mixture at a high velocity in a direction tangent to the cylindrical wall of the first zone. Richardson injects the air and fuel gas separately, axially and radially directly towards the cylindrical wall at a high velocity. This difference in the injection affects the rate of mixture of the feedstock with the hot combustion gases, the movement and flow of both the gases and the feedstock through the furnace, and the manner and timing of applying heat to the feedstock.

3. *Mixture, flow and heating of the products.* In Phillips' testative findings of fact and conclusions of law submitted after the close of the evidence, Phillips proposed the following finding on the question of whether the Rembert Patent No. 2,090,766 anticipated the patent in suit: " * * * Thus, this method [Rembert] involves instantaneous heating of the hydrocarbon as distinguished from *the delayed and controlled heating and mixing of the method of the patent in suit.*" This same point about delayed and controlled heating and mixing was urged in the Patent Office to distinguish this Krejci process from the prior art when the application for the patent in suit was pending. This basic distinction also applies in a comparison of the Phillips and the Richardson processes. The swirling, helical flow of the hot combustion gases in the Phillips process and the resulting centrifugal force cause the feedstock to follow the vortex and the gases to hug the walls of the furnace. This is what Claim 26 refers to when it speaks of the hydrocarbon being surrounded by the hot combustion gases. Even Phillips' experts referred to this as a blanketing action. There is no sudden heating and mixing of the hydrocarbon with the combustion gases. The heat that decomposes the feedstock is radiated from the hot combustion gases as the products proceed through the reaction zone. There is

practically no mixing of the hydrocarbon and the combustion gases until they come in contact with the water at the quench ports. The Richardson process is just the opposite. There is no swirling movement, no vortex, no centrifugal force, no blanketing action in the Richardson method. There is nothing that resembles the principle of delayed and controlled heating and mixing which Phillips has always considered as fundamental to its patent. Richardson seeks to bring about a sudden and intense mixture of the feedstock and the hot combustion products immediately after the combustion mixture has burned. That is the purpose of the choke ring or zone which has no counterpart in the Phillips method. The movement of the mixture of the combustion gases and the hydrocarbon is a turbulent or boiling one, and the flow is linear throughout the furnace. The application of heat to the feedstock is likewise early and sudden. It comes, not from radiation, but from the feedstock being intimately mixed with the hot combustion products. These differences are fundamental.

■ Phillips attempts to avoid the effect of the differences in the injection of the combustion products and the type of flow through the furnace by arguing that there is nothing said in Claim 26 about tangential injection and spiral flow. For the reasons pointed out in subdivision (b) of footnote 2, Phillips is in a poor position to urge that the omission of any mention of these aspects from that claim broadens it to the point where it can be read on the accused process. All of the examples and all of the other 28 claims of the patent in suit specifically call for such tangential injection. Dr. Krejci contended before the Patent Office that this manner of injection and the resultant flow described in his application for Patent 700 was the one which most strongly differentiated his process from ones covered by prior patents. DX-183 is a collection of twelve patents granted Phillips after the date of the patent in suit. Dr. Krejci was the inventor in some of them. All of them de-

scribe Patent 700 in terms of tangential injection of combustion gases and of a helically moving blanket of hot gases surrounding the vaporous feedstock. The conclusion is inescapable that even though Claim 26 does not specifically mention tangential injection, swirling movement or helical flow, they are just as essential steps in the process decribed as if they had been spelled out. Claim 26 does provide that the hydrocarbon be surrounded by hot combustion gases during its course through the two zones of the furnace. No person, expert or otherwise, has been able to give the slightest hint as to how this "surrounding" can be accomplished other than by a swirling movement and helical flow of the hot combustion gases. Likewise, no one has been able to give any suggestion as to how such movement and flow can be created other than by tangential injection of the combustion gases. " * * * [A] patentee's broadest claim can be no broader than his actual invention * * " Kemart Corp. v. Printing Arts Research Laboratories, 9 Cir., 201 F.2d 624, 629 (1953). When Claim 26 is read in connection with the specifications, as must be done under the rule announced in the *Kemart* case, it described the process as it is actually practiced by Phillips in the manner hereinbefore set forth. The evidence shows without question that the only way the process described in Claim 26 can possibly have any degree of utility is for it to be conducted in the manner hereinbefore described. That is the only manner in which it can be successfully performed. If the process were not so conducted, it would be wholly inoperative as far as its claimed function is concerned.

Even if the surrounding of the hydrocarbon feedstock by hot combustion gases expressly provided for in Claim 26 could be accomplished without tangential injection, the Court would still be of the opinion that the basic and important differences in the flow, mixing and heating establish that there is no infringement.

■■■■■ Phillips contends that the procedures in the accused process are mere equivalents of the steps in the process covered by Claim 26.[5] An inventor is entitled to a fair range of equivalents commensurate with the scope of his invention. Cameron Iron Works v. Stekell, 5 Cir., 242 F.2d 17, 22 (1956); Up-Right, Inc. v. Safeway Products, Inc., 5 Cir., 315 F.2d 23, 26 (1963). The differences between the procedures in question do not come within the rule of equivalents because the processes do not function in substantially the same way. The natural forces involved are applied in a significantly different order and in a different manner. Great Lakes Carbon Corporation v. Continental Oil Co., supra, at p. 476 of 219 F.Supp.; Kemart Corp. v. Printing Research Laboratories, supra, at p. 629 of 201 F.2d; Cochrane v. Deener, supra, at p. 788 of 94 U.S., and p. 141 of 21 L.Ed. The novel application of universally known natural laws relating to heat and motion has been the basis for the patented processes invented by Tilghman, Whitney, and Harley, which had such an important influence on the manufacture of soap, railroad wheels and metal pipe, respectively. Mitchell v. Tilghman and Tilghman v. Proctor, both supra; Mowry v. Whitney, 14 Wall. 620, 20 L.Ed. 860 (1872); McClure v. Kingsland, 1 Howard 202, 11 L.Ed. 102 (1943). With Tilghman and Whitney, it was the

5. A portion of the test for determining equivalence has been quoted earlier. The full quotation is: " * * * [T]he real test of equivalence is whether the alleged process functions in substantially the same manner and under the same physical laws to produce the same result as that of the patented process. * * * " Great Lakes Carbon Corp. v. Continental Oil Co., at p. 476 of 219 F. Supp.

The portion of the opinion in Cochrane v. Deener here referred to emphasized that the process required "that certain things be done with certain substances and *in a certain order*." (emphasis added). The difference in order is particularly applicable to the application of heating and mixing in the present case.

manner and order in which they used heat. With Hartley, it was the rotary motion of molten metal resulting from its tangential introduction into a cylindrical mould. That motion produced a centrifugal force that drew the flog and dross in the metal from the circumference of the tubing to the center of the mould. So it is in the present case; the application of the forces of heat, mixing and motion in the Richardson process is done in such a distinctive manner from the use of those forces in the Phillips method that the processes are legally different under the patent laws.

The Court cannot agree with Phillips that the differences here involved are mere variations of the details of the patented process, as existed in Tilghman v. Proctor, supra, or that such differences are structural rather than process, as was discussed in Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935), and Duo-Flex Corp. v. Building Service Co., 5 Cir., 322 F.2d 94, 100 (1963). The Court regards them as being so basic as to establish that the accused process does not, "in all substantial aspects", follow the method covered by Claim 26. Universal Oil Products Co. v. Globe Oil & Ref. Co., 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); United States Rubber Co. v. General Tire & Rubber Co., 6 Cir., 128 F.2d 104, 109 (1942); Kemart Corp. v. Printing Arts Research Laboratories, supra.

 The Court is of the opinion that there has been no infringement, whether the processes in question are viewed in terms of process steps without giving any consideration to the geometry of the furnaces, or in terms of the process steps and the apparatus used in connection therewith.

The defendants failed to meet their burden of proving that Phillips acted in bad faith in the prosecution of this suit. Any attempt to go into this question in depth would require a detailed discussion of the evidence, and there is not enough merit in this contention to justify that. The Court is of the opinion that the evidence established that Phillips has acted in good faith.

The Court concludes that the actions for judgment declaring the patent in suit to be invalid should be dismissed on the ground that they are moot, and that all other affirmative relief requested by the parties should be denied. Judgment will be entered accordingly.

This opinion will serve as the Court's findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.